UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>(1) MICHAEL CHONG,<br><br>Defendants. | Case No.  CR 15-00176-AB<br><br>**[REDACTED][1] [IN CHAMBERS] MEMORANDUM OF DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MICHAEL CHONG'S MOTION TO SUPPRESS EVIDENCE (DKT. NO. 39.)** |

 Pending before this Court is Defendant Michael Chong's motion to suppress various items of evidence and one statement obtained in the course of his March 9, 2015 detention and eventual arrest by the Los Angeles Police Department ("LAPD"). (Dkt. No. 39.)  After full consideration of the briefs, supporting evidence, and the parties' oral argument, and as stated more fully below, the Los Angeles Police Officers reasonably detained Chong, and Chong lacks standing under the Fourth Amendment to challenge the bulk of items the Officers searched.  Additionally, the Government has met its burden of proving that most of the remaining items which

---

[1] The Court filed its full order under seal to protect the identities of non-party alleged victims at this early stage of the proceedings.  (Dkt. No. 62.)  The Court separately files this publicly available version of its order with appropriate redactions to protect those non-parties' identities.

Chong has standing to pursue under the Fourth Amendment would have been inevitably discovered in a routine post-arrest search.  However, as to the contents of a notebook, the contents of a check register, and all but the top layer of checks in a plastic envelope (Dkt. Nos. 2, 6, 7), Chong has established standing and the Government has meet its burden of establishing any exception to the Fourth Amendment's warrant requirement.  Finally, because Chong was not in custody at the time the Officers asked him a limited question about the ownership of certain items, the Officers had no obligation to advise Chong of his *Miranda* rights before they asked him the question.

Accordingly, the Court **DENIES** the motion **IN PART** and **GRANTS** the motion **IN PART** as more fully stated below.  (Dkt. No. 39.)

## I.       BACKGROUND

On March 9, 2015, LAPD Officers Jacks and Lucero were driving their patrol car when they saw an older-model Acura parked in a CVS Store parking lot and decided to check the Acura's license plate.  (Police Report, Dkt. No. 39-1, p. 2.)[2]  The driver was not in the car, but Defendant Michael Chong was sitting in the passenger's seat at the time.  (*Id.*)  The Officers' license-plate inquiry showed that the license plate was issued to a 1996 Chrysler, not an Acura.  (*Id.*)  In light of the discrepancy, Officers Jacks and Lucero stopped their car and approached the Acura to investigate the possibility of a forged or counterfeit license plate.

---

[2] The fact summary in Officer Lucero's police report largely mirrors the facts outlined in U.S. Postal Inspector Wilford Claiborne's search warrant affidavits.  (Dkt. No. 39-2, pp. 6-13; Dkt. No. 39-3, pp.6-13.)  For the sake of brevity, the Court limits its citation to the Police Report to the extent the facts in the police report and in Inspector Claiborne's affidavits overlap.

Once at the car, the Officers directed Chong to step out of the Acura.  (Dkt. No. 39-1, p. 2.)  Chong dropped a number of notebooks and other papers that were lying on his lap as he got out of the car.  (*Id*.)  Some (but apparently not all) of the papers fell onto the ground outside the car as Chong stood up.  (*Id*; Warrant Affidavit, Dkt. No. 39-2, ¶15d-15f.)  Officer Jacks gave Chong a pat-down search and felt a hard, sharp object in Chong's right-front pants pocket.  (Dkt. No. 39-1, p. 2.)  Officer Jacks pulled the object out of Chong's pocket and found it to be a "sharp/jaded key" that the Officers believed to be a mail master key (also known as an "arrow key").  (*Id*.)  Officer Lucero then picked up the papers that had fallen outside the car and placed them with the rest of the papers Chong had left inside the car.  (*Id*.)  Officer Lucero reported that the "[f]allen items included mail, checks and various paperwork with various names."  (*Id*.)  After patting Chong down and putting the fallen papers back in the Acura, the Officers asked Chong who owned the Acura, and Chong said he "was waiting in the car for the vehicle owner known to him as 'Amber,'" who Chong described as a slender, white female.  (*Id*.)  "Amber" turned out to be co-Defendant Kaitlyn McClintock.  (*Id*.)

Officers Jacks and Lucero called for an additional unit, and LAPD Officers Rangel and Garcia came to the CVS shortly after the pat-down.  (Dkt. No. 39-1, p. 2.)  Officer Rangel went into the CVS where he soon found McClintock and escorted her out of the store.  (*Id*.)  McClintock told the Officers she had paperwork for the Acura and that she recently bought the car for $900.  (*Id*.)  Officer Lucero found the car's paperwork in the trunk, which showed the Acura was registered to Karen Garcia and Willie Melchor in Los Angeles, not McClintock.  (*Id*.)  One of the officers then asked Chong whether the papers he was previously holding in his lap belonged to him, and Chong said, "Yes."  (*Id*.)

///

///

3

1     The Officers located the Acura's VIN and discovered that its registration had
2   expired nearly two years earlier on February 8, 2013.  (Dkt. No. 39-1, p. 2.)  Officer
3   Lucero then impounded the Acura under California Vehicle Code section 22651(o)
4   and removed the license plates.  (*Id*.)  The Officers also took Chong and McClintock
5   into custody, taking them to the LAPD's Olympic station.  (*Id*., at p. 3.)  At Olympic
6   station, LAPD officers conducted an inventory search of the car, finding found
7   "various amounts of Mail Pieces from different locations and different recipient
8   names."  (*Id*.)  Having placed Chong and McClintock under arrest, the Officers also
9   conducted an inventory search of their personal property, including "various amounts
10   of Mail Pieces from different locations, and different recipient names."  (*Id*.)  In their
11   inventory search of McClintock's purse, the Officers also found checks matching the
12   names on the mail they found.  After some initial investigation, Officers Jacks and
13   Lucero found that many of the people whose names were on the checks and mail
14   reported that they were missing various checks and mail.  (Dkt. No. 39-1, p. 3.)  The
15   Officers suspected Defendants of mail theft, and contacted U.S. Postal Inspector
16   Wilford Claiborne.  (*Id*., at p. 4.)

17

18     Inspector Claiborne met Officers Lucero and Jacks at Olympic station and then
19   went in to interview McClintock.  (Dkt. No. 39-2, pp. 10-11.)  McClintock had read
20   and signed a *Miranda* waiver and told Claiborne that, for the past two weeks,
21   McClintock had been working with Chong to steal and deposit stolen checks.  (*Id*., at
22   p. 11.)  According to McClintock, Chong would steal mail using his arrow key, and
23   McClintock would deposit the checks.  (*Id*.)  Chong and McClintock would then split
24   the proceeds from depositing the stolen checks.  (*Id.*)  McClintock also told Inspector
25   Claiborne that she intended to deposit the checks found in her purse during the
26   inventory search.  (*Id*.)
27   ///
28   ///

4

The United States charged Chong and McClintock in a criminal complaint the next day (Dkt. No. 1), and obtained warrants to search Chong's home and cell phone on March 11.  (Dkt. No. 39-2, Dkt. No. 39-3.)  The Government now charges Chong by indictment with:

- Conspiracy to Commit Bank Fraud (18 U.S.C. § 1349);
- Bank Fraud and Attempted Bank Fraud (18 U.S.C. § 1344);
- Conspiracy (18 U.S.C. § 371);
- Possession of Stolen Mail (18 U.S.C. § 1708);
- Unlawful Possession of a Counterfeit Postal Key (18 U.S.C. § 1704); and
- Aggravated Identity theft (18 U.S.C. § 1028A(a)(1)).

(Dkt. No. 24.)[3]

Defendant Chong moves to suppress evidence of the arrow key, the papers in Chong's lap, and Chong's statement that the papers belonged to him as unlawfully obtained under the Fourth and Fifth Amendments.  (Dkt. No. 39, p. 2.)  Chong also moves to suppress evidence obtained in the course of executing the search warrant on his home as fruits of the proverbial poisonous tree.  (*Id.*)

## II.    LEGAL STANDARD

### A.    Searches and Seizures Under the Fourth Amendment

"The Fourth Amendment provides in relevant part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'"  *United States v. Jones*, __ U.S. __ 132

---

[3] The United States also brings related charges against McClintock, but this motion and the Court's analysis is limited to Defendant Chong.

S. Ct. 945, 949 (2012).   "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993).

A defendant subjected to a warrantless search and seizure that does not fall within any exception to the warrant requirement may move to suppress that unlawfully obtained evidence at trial.   Fed. R. Crim. P. 41(h); *see Weeks v. United States*, 232 U.S. 383 (1914) *and Mapp v. Ohio*, 367 U.S. 643 (1961).   This "exclusionary prohibition" also extends "to the indirect…product products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *accord Segura v. United States*, 468 U.S. 769, 804 (1984).   But not all evidence is "fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Hudson v. Michigan*, 547 U.S. 586, 592, quoting *Wong Sun v. United States, supra*, 371 U.S. at 487-88.   The operative question in determining whether to exclude evidence obtained as an indirect result of an initially unlawful search or seizure is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*. (internal quotes omitted).   Upon a defendant's motion, the Government bears the burden of showing that a warrantless search falls within one of the delineated exceptions to the warrant requirement.   *United States v. Huguez-Ibarra*, 954 F.2d 546, 551 (9th Cir. 1992).   The Government must meet that burden with "proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

Nonetheless, "a person seeking to exclude evidence allegedly obtained in violation of the fourth amendment must have standing to challenge the illegal conduct

that led to the discovery of the evidence." *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005). To establish standing "the defendant must establish that he or she had a 'legitimate expectation of privacy' in the place searched or in the property seized." *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986), quoting *Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978). The "legitimate expectation of privacy" requirement means a defendant seeking to suppress evidence must show: (1) that he or she "exhibited an actual, subjective expectation of privacy, and, more importantly"; (2) that the defendant's subjective expectation of privacy was "one that society is prepared to accept as reasonable and therefore, legitimate." *United States v. Kovac*, 795 F.2d at 1510, citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

Put simply, a "person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured *by a search of a third person's premises or property* has not had any of his Fourth Amendment rights infringed." *United States v. Pulliam*, *supra*, 405 F.3d at 785-86, quoting *Rakas v. Illinois*, *supra* 439 U.S. at 134 (emphasis added). For example, "a passenger with no possessory interest in the car" generally "has no reasonable expectation of privacy in [the] car that would permit [his] Fourth Amendment challenge to a search of the car." *United States v. Pulliam*, *supra*, 405 F.3d at 786. Likewise, "[t]he Fourth Amendment does not protect a defendant from a warrantless search of property that he stole, because regardless of whether he expects to maintain privacy in the contents of the stolen property, such an expectation is not one that 'society is prepared to accept as reasonable.'" *United States v. Caymen*, *supra*, 404 F.3d at 1200 (9th Cir. 2005), quoting *Smith v. Maryland*, *supra*, 442 U.S. at 740.

The defendant, not the government bears the burden of proof on the issue of Fourth Amendment standing. *Rakas v. Illinois*, *supra*, 439 U.S. at 130 n.1. Whether the defendant had a legitimate expectation of privacy in the place searched or the

7

items seized is "threshold question" that a defendant must answer before courts will "consider whether the search was reasonable." *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007). The defendant must make that showing with evidence, and a "mere claim of a possessory interest is not sufficient to confer standing to challenge an alleged Fourth Amendment violation." *United States v. Rodriguez*, __ F. Supp. 3d __, 2015 WL 1756814, at *8 (C.D. Cal. Apr. 15, 2015); *accord United States v. Caymen*, 404 F.3d 1196, 1200 (9th Cir. 2005) (defendant failed to establish standing under the Fourth Amendment where Defendant did not offer any sworn statement to support his unsworn claim to police officers that he owned a laptop); 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 11.3(e), p. 264 n.354 (5th ed. 2012) ("The burden of proof is on the defendant to establish standing," and "a conclusory claim of ownership will therefore not necessarily suffice.").

## B.    Motions to Suppress Under *Miranda v. Arizona* and the Fifth Amendment

Individuals may not be subjected to custodial interrogation without being advised of their Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). The inquiry underlying whether someone is in custody for purposes of *Miranda* is whether a reasonable person would have believed that they were not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 555 (1980); *see also Stanley v. Schriro*, 598 F.3d 612, 628 (9th Cir. 2010). "Pertinent" factors to consider in determining whether someone is in custody "include the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1985).

A defendant subjected to custodial interrogation without first being advised of his or her *Miranda* rights may move to suppress evidence of the custodial statement and any "fruits" derived therefrom.  Fed. R. Crim. P. 41(h); *Lego v. Twomey*, 404 U.S. 477, 488 (1972); *accord Mariano v. Ryan*, No. CV 05-2784-GAF (MAN), 2010 WL 2851308, at *29 (C.D. Cal. May 18, 2010) ("If a suspect is not advised of his Miranda rights prior to an interrogation, any statements he makes during the interrogation, whether inculpatory or exculpatory, may be excluded from evidence.")   Once the court determines that a defendant was in custody for the purposes of *Miranda*, "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary" under the circumstances.  *Lego v. Twomey*, 404 U.S. at 489.  However, "the Ninth Circuit has never decided which side bears the initial burden of proving custody or a lack of custody."  *United States v. Hayes*, No. 13-CR-00085-JD-1, 2014 WL 5408425, at *3 (N.D. Cal. Oct. 22, 2014), quoting *United States v. Paiz*, No. CR 06–00710 WHA, 2007 WL 1052891, at *3 n.2 (N.D. Cal. Apr. 5, 2007); *compare United States v. Davis*, 792 F.2d 1299, 1308 (5th Cir. 1986) (defendant bears "the burden of proving that he was under arrest or in custody" for on a motion to suppress for a *Miranda* violation).[4]

## III.   DISCUSSION

Defendant asserts a number of ways in which the May 9, 2015 stop in the CVS parking lot violated his rights under the Fourth and Fifth Amendments.  The Court examines each of these arguments in turn.

---

[4] In many ways, the Fifth Circuit's rule placing the burden on the defendant to make the threshold showing of custody is analogous to the Fourth Amendment's standing requirement, which also places the "threshold" burden on the Defendant to prove the foundational requirement before shifting the burden to the Government to prove its action was constitutionally justified.  However, neither Chong nor the Government addresses the burden of proof on the issue of custody, nor do they argue that it is necessary to resolve that unsettled question for the purposes of this motion.

**A.     The Officers' Decision to Order Defendant Out of the Car and Briefly Detain Him Was Reasonable**

Chong first argues that the Court must suppress any evidence obtained from the Officers' interaction with him because Officers Jacks and Lucero had no basis under the Fourth Amendment to order Chong out of the car.  (Dkt. No. 39, pp. 4-6; Dkt. No. 49, pp. 15-16.)  "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Chong does not dispute that Officers Jacks and Lucero had a sufficiently reasonable suspicion to suspect that the Acura was using a forged or counterfeit license plate when their in-car computer showed the license place on the Acura was registered to a 1996 Chrysler.[5]  Instead, Chong argues that it was unreasonable to order him out of the car because "Mr. Chong was not the driver of the car and, in fact, the driver was *not even present* when police officers approached the car and ordered Mr. Chong to exit the car."  (Dkt. No. 39, p. 5 [emphasis in original].)

Irrespective of whether Officers Lucero and Jacks had reasonable suspicion to believe that "criminal activity was afoot," the fact that the Acura bore mismatched license plates gave Officers Lucero and Jacks authority under California law to impound the car.  California law provides that a peace officer may impound any vehicle "found or operated upon…an offstreet parking facility" where the vehicle is "[d]isplaying, in or upon the vehicle, an altered, forged, counterfeit, or falsified…license plate…."  Cal. Veh. Code § 22651(o)(1)(B)(2); *accord Hylton v.*

---

[5] Chong describes the Officers' initial approach as a "stop" (Dkt. No. 39, p. 4 n.2) but offers no authority to suggest that a law enforcement officer's decision to walk up to a parked car in a public parking lot is itself a seizure under the Fourth Amendment, and the Court finds none.  Nor did Defendant ever supplement the motionj with any evidence that would undermine the Officers' statement that they "viewed a license plate that failed to match the description of the Acura."  (*Id.*)

*Anytime Towing*, 563 Fed. App'x 570 (9th Cir. 2014) (impound and inventory search were reasonable under the Fourth Amendment where authorized under Cal. Veh. Code § 22651(o)); *United States v. McCartney*, 550 F. Supp. 2d 1215, 1225 (E.D. Cal. 2008) aff'd, 357 Fed. App'x 73 (9th Cir. 2009) (same).   As peace officers, Officers Jacks and Lucero had authority to impound the vehicle, *even though it was occupied*. Cal. Veh. Code § 22651(o)(1)(B)(3); *Miranda v. City of Cornelius*, 429 F.3d 858, 865 (9th Cir. 2005) ("An impoundment may be proper under the community caretaking doctrine if the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle.")  Chong does not argue that it was unreasonable for Officers Jacks and Lucero to order Chong out of the car before they impounded it.

But even in the absence of California Vehicle Code section 22651(o)(1)(B), it is settled that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Chong attempts to distinguish this rule on the grounds that there was no driver in the car when Officers Jacks and Lucero approached it and "any traffic violation would have been committed by the driver…." (Dkt. No. 39, p. 5.)  But Chong offers no compelling reason why the Court's analysis should turn on such a distinction.  Once the Officers had a reasonable suspicion to believe criminal activity was afoot, the Fourth Amendment vested them with authority to order any occupant out of the car "as a matter of course" without "need to have an *independent* fear for [their] safety." *United States v. Ruidiaz*, 529 F.3d 25, 32 (1st Cir. 2008); *accord Maryland v. Wilson*, 519 U.S. at 410 (holding rule "that a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle, extends to passengers as well"). That there was no one in the driver's seat is immaterial because "the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a [traffic] violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." *Arizona v. Johnson*, 555 U.S. 323, 331

(2009), quoting *Maryland v. Wilson*, *supra*, 519 U.S. at 414.  That risk "is present regardless of whether the occupant of the stopped car is a driver or a passenger." *Maryland v. Wilson*, 519 U.S. at 413.

Such a risk was only heightened here because the "traffic violation" at issue–using forged or stolen license plates–is more indicative of possible criminality than other traffic violations like a broken tail light or speeding.  Use of a mismatched license plate creates a strong (and reasonable) presumption that the vehicle, the license plate, or both are stolen.  Approaching a potentially stolen car, it was entirely reasonable under the circumstances for Officers Jacks and Lucero to order the sole occupant out of the car while the Officers investigated.  "The government's legitimate and weighty interest in officer safety…outweigh[ed] the *de minimis* additional intrusion" on Chong's right to be free from warrantless seizures by requiring him to exit a vehicle that the Officers had good reason to believe was stolen or otherwise implicated in criminal activity.  *Arizona v. Johnson*, 555 U.S. at 331 (internal quotes omitted); *accord Ingram v. City of Los Angeles*, 418 F. Supp. 2d 1182, 1191 (C.D. Cal. 2006) aff'd, 331 F. App'x 462 (9th Cir. 2009) ("Where a traffic stop is based on reasonable suspicion, an officer may order the occupants to exit the vehicle notwithstanding that there is no reason to suspect foul play from the vehicle's occupants.")

Defendant's reliance on *Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 1615 (2015) for the proposition that "the detention of Mr. Chong was wholly unrelated to the purported reason for approaching the vehicle" (Dkt. No. 39, pp. 5-6; Dkt. No. 49, pp. 15-16) is also unavailing.  Although a lawful detention "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop, *Illinois v. Caballes,* 543 U.S. 405, 407 (2005), there is nothing in the record to suggest the Officers detained Chong longer than the amount of time

reasonably necessary to investigate whether the license plates were counterfeit or the car stolen.   If anything, the High Court's holding *Rodriguez v. United States* emphasizes that the Officers did precisely what an officer who suspected a vehicle was using forged or counterfeit license plates would do – they ordered the sole occupant out of the car, asked him who owned the car, attempted to locate the driver, and then attempted to verify the driver's claim of ownership by locating the proof of registration. *Rodriguez v. United States*, 135 S. Ct. at 1615 ("Typically such inquiries [on traffic stops] involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance").   Chong does not dispute that McClintock was in the CVS Store when the Officers first approached, and it naturally took some time to locate her in the course of their investigation.   That the Officers also briefly patted him down and picked up the papers he had dropped on the ground did "not convert the encounter into something other than a lawful seizure" because those unrelated "inquiries [did] not measurably extend the stop's duration" beyond what it would have otherwise taken to locate and question McClintock.  *Arizona v. Johnson*, *supra*, 555 U.S. at 325.

## B.     The Initial Pat Down Was Not Reasonable Under the Circumstances

Chong next argues that, even if Officers Jacks and Lucero lawfully ordered him out of the car and briefly detained him, they had no justification under the Fourth Amendment to conduct the pat-down search.  (Dkt. No. 39, pp. 6-7.)  The fact that the Officers Jacks and Lucero reasonably detained Chong while they investigated the mismatched license plates does not, by itself justify their pat-down search.  *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988) ("A lawful frisk does not always flow from a justified stop").   "[O]fficers who conduct routine traffic stops may [only] perform a 'patdown' of a driver and any passengers upon reasonable suspicion that

13

they may be armed and dangerous." *Arizona v. Johnson*, 555 U.S. at 332.  Courts look at the "totality of the circumstances surrounding the stop" to determine whether there were "specific, articulable facts which, together with the objective and reasonable inferences" suggested that the occupant may have been armed and dangerous.  *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (internal quotes and edits omitted).

The Government's *two sentence* argument in opposition (Dkt. No. 45, p. 23:6-13) to suggest that the Officers had a reasonable suspicion to believe Chong was armed and dangerous is telling.  When the Officers approached the Acura, Chong was sitting in the passenger seat in a parking lot in broad daylight.  They had no other information to suggest that Chong might be armed and dangerous.  *See United States v. Thomas*, *supra*, 863 F.2d at 624 (no reasonable suspicion to frisk possible counterfeiting suspect where officer detained suspect in parking lot in broad daylight). Notably, the Officers did not even attempt to articulate why they believed Chong may have been armed and dangerous in their investigative report.  Without more, the Government cannot meet its burden of proving that Officers Jacks and Lucero had a reasonable suspicion to believe Chong was armed and dangerous, and the Court must exclude the fruit of that unlawful search – the arrow key – absent some other exception to the Fourth Amendment's warrant requirement.  As discussed more fully below, however, the inevitable discovery exception applies to the arrow key, and it is admissible notwithstanding the unlawful pat-down.

### C.    Chong Has Not Established Standing to Challenge the Search of Many of the Papers on the Ground and in the Car

Chong briefly asserts that the Court must suppress the papers that fell from his lap as he exited the vehicle because the officers lacked any independent basis to rifle

1  through the papers.  (Dkt. No. 39, p. 7.)  Expanding on this argument in reply, Chong

2  contends that, even if the papers were in plain view, the police report does not make

3  clear whether their incriminating nature was "immediately apparent" to the officers at

4  the time.  (Dkt. No. 49, pp. 8-10, citing *Coolidge v. New Hampshire*, 403 U.S. 440,

5  466 [1971].)    Chong goes on to argue that the government has failed to meet its

6  burden to show which documents would have been inevitably discovered during a

7  post-impoundment inventory search or that the Officers had consent to search the

8  Acura.  (Dkt. No. 49, pp. 10-14.)

9

10      Notably, however, Chong fails to meet his threshold burden to establish a

11  legitimate expectation of privacy in either the vehicle or many of the papers and other

12  items in his lap.  Indeed, Chong concedes that he does not have "standing to challenge

13  the search of the car generally."[6]  (Dkt. No. 49, p. 7.)  Although Chong does argue that

14  he had reasonable expectation of privacy in the "documents that the police observed

15  on his own lap," this argument is equally unsupported in the record with the mail,

16  bank statements, checks, identification cards, credit cards, and income statements

17  addressed to or bearing the information of:

18

19      • ████████████;

20      • ████████████;

21      • ████████████;

22      • ████████████;

23      • ████████████;

24

---

25  [6] This concession alone defeats Chong's subsequent argument that "the government fails to justify,
26  under the Fourth Amendment, the impoundment of the car."  (Dkt. No. 49, p. 12:8-9.)  In addition to
    being incorrect as a matter of law (see section III.A, *supra*), Chong concedes that he lacked a
27  legitimate expectation of privacy in the Acura.  Without that expectation, he has no standing to
    object to the lawfulness of the Officers' decision to impound it.  *United States v. Pulliam*, *supra*, 405
28  F.3d at 786.

1   • ██████████ ;

2   • ██████████ ;

3   • ██████████ ; and

4   • ██████████ .

5

6   (Dkt. No. 61, Exh. 3, 4, 11, 12, 13, 14, 23, 24, & 25).   Nor has Chong argued or

7   offered evidence to show that he had any reasonable expectation of privacy in several

8   other banking documents that do not identify the addressee or account-holder.   (Dkt.

9   No. 61, Exh. 26, 27, 28, 29, & 30.)[7]   Again, it is Chong's burden to demonstrate both

10  a subjective *and objective* expectation of privacy in the papers. *Rakas v. Illinois*,

11  *supra*, 439 U.S. at 130 n.1.

12

13      Despite that burden and the Government's challenge to Chong's "reasonable

14  and legitimate expectation of privacy in the stolen mail, checks, [] credit cards, and

15  paperwork bearing other persons'" personal identifying information (Dkt. No. 45, p.

16  13), Chong offers no evidence whatsoever to establish that he had an objective

17  expectation of privacy in the Third-Party Documents bearing *third parties'* personal

18  and financial information.   This is especially problematic here because those Third-

19  Party Documents are some of the very documents Chong is accused of stealing.

20  *United States v. Goldstein*, No. 2:10-CR-00525-JAD, 2013 WL 5408265, at *3 (D.

21  Nev. Sept. 25, 2013) ("Defendant…has made no effort to demonstrate that his use of

22  the Yukon, which he is accused of carjacking, was anything but unauthorized").

23  "[O]ne who takes property by theft or fraud cannot reasonably expect to retain

24  possession and exclude others from it once he is caught. Whatever expectation of

25  privacy he might assert is not a legitimate expectation that society is prepared to

26

27  _____

    [7] Collectively, the Court refers to these documents as the "Third-Party Documents."  Again, those
28  documents are found at Docket Number 61, Exhibits 3, 4, 11-14, and 23-30.

1   honor."  *United States v. Caymen*, 404 F.3d at 1201.

2

3       All of the evidence (including Chong's own evidence in support of the motion)

4   supports the inference that the various Third-Party Documents were stolen, and

5   Chong's conclusory assertion that he had a possessory interest in those documents is

6   insufficient to overcome that evidence and satisfy Chong's burden to prove standing.[8]

7   *United States v. Rodriguez, supra*, 2015 WL 1756814, at *8 (C.D. Cal. Apr. 15, 2015)

8   (a defendant's "mere claim of a possessory interest is not sufficient to confer standing

9   to challenge an alleged Fourth Amendment violation"); *accord United States v.*

10  *Caymen, supra*, 404 F.3d at 1200 (defendant failed to establish standing under the

11  Fourth Amendment where he did not offer any sworn statement to support his

12  unsworn claim to police officers that he owned allegedly stolen laptop).   Indeed,

13  Chong's own evidence shows that a number of those third-parties reported the Third-

14  Party Documents stolen.  (Dkt. No. 39-1, pp. 3-4.)

15

16          **1.      Chong Has Proven Standing as to a Handful of Items, and**

17                  **the Government Has Failed to Establish that the**

18                  **Incriminating Nature of that Evidence Was in Plain View**

19

20       However, Chong has met his burden of establishing both objective and

21  subjective expectations of privacy in several other items retrieved from the scene.

22  Many of the items recovered were checks, credit cards, mail, or bank statements

23

24  [8] The Court emphasizes that concluding Chong has failed to meet his burden of proving he had a
    legitimate expectation of privacy in the allegedly stolen documents for the purposes of a suppression

25  motion is not the same as saying Chong bears the burden of disproving theft at trial.  For the limited
    purposes of a suppression motion, however, Chong bears the burden of proof on his claim of

26  standing, and the Court must weigh the evidence to determine whether he has met that burden.  *See*
    *United States v. Mattarolo*, 209 F.3d 1153, 1155-56 (9th Cir. 2000) (noting that courts of appeal

27  "review a district court's factual findings at a suppression hearing for clear error" and "accept[ing]
    the district court's findings of fact" on the suppression motion).

28

bearing personal information of or addressed to J.S. and S.J.  (Dkt. No. 61, Exh. 1, 5, 6-10, 15-22.)  J.S. and S.J. appear to be Chong's parents, and they told Officer Lucero over the phone that Chong had permission to have the documents in his possession.  (Dkt. No. 39-1, p. 3.)  As to those documents, there is nothing in the record that would satisfy the Government's burden of proving that the incriminating nature of the documents was immediately apparent at the time Officers Jacks and Lucero seized them.[9]

Likewise with the check register containing numerous blank checks in J.S.'s name, as the record is silent on whether that booklet was open (with its contents exposed to the world) or closed (with no incriminating information whatsoever exposed) at the time the Officers found it.  And although a number of blank checks in J.S.' name were apparently found inside a transparent plastic envelope through which it is possible to see the envelope's contents (Dkt. No. 61, Exh. 7), the Government fails to offer any evidence that the transparent envelope was visible where it lay (rather than covered by any other items over which Chong enjoyed an expectation of privacy) at time the Officers found the envelope on the ground or in the car.

Finally, the Government conceded at the hearing that the notebook Officers Jacks and Lucero recovered at the scene (Dkt. No. 61, Exh. 2) contains Chong's personal handwriting.  Unlike the other documents at issue, there is nothing in the record to indicate that the notebook was stolen, even if Chong illegally obtained the information recorded in the notebook.  *See United States v. Carnes*, 309 F.3d 950, 959 (6th Cir. 2002) (defendant had legitimate expectation of privacy in audio-tapes

---

[9] For example, was the credit card bearing J.S.'s name (Dkt. No. 61, Exh. 10) immediately visible, or was it buried under the notebook (Dkt. No. 61, Exh. 2)?  The Government offers no evidence one way or the other and fails to meet it burden of proving which, if any, of the documents were in plain view at the scene.

containing illegally recorded phone conversations because where the "tapes themselves were not stolen"). The Court finds that Chong's possession of a notebook filled with his own handwriting – which Chong claimed was his – sufficient to meet Chong's burden of establishing a legitimate expectation of privacy in the notebook. Although the notebook does appear to contain facially incriminating information (personal identifying information for numerous third-parties), the Government fails to introduce any evidence suggesting that the incriminating evidence was in plain-view at the time the Officers saw it. There is nothing incriminating about the cover or back of the notebook (only its contents), and there is no evidence that the notebook was open at the time.

### D.    Inevitable Discovery

The Government also argues that the arrow key and any documents in which Chong may have had a legitimate expectation of privacy are admissible because the Officers would have inevitably discovered them in the course of a subsequent lawful search. The doctrine of inevitable discovery operates as an exception to the exclusionary rule. *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir.1986) "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means…then the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "[I]f, 'by following routine procedures, the police would inevitably have uncovered the evidence,' then the evidence will not be suppressed despite any constitutional violation." *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009), quoting *United States v. Ramirez–Sandoval*, 872 F.2d 1392, 1399 (9th Cir.1989).

### 1. The Government Has Met its Burden of Proving Inevitable Discovery of the Arrow Key

As discussed above, Officers Jacks and Lucero exceeded their authority under the Fourth Amendment when they frisked Chong and seized the arrow key without any reasonable basis to believe he may have been armed and dangerous.  However, the record demonstrates that the Officers would have inevitably discovered the arrow key in both a search incident to arrest and a post-arrest inventory search.

"It is settled Fourth Amendment doctrine that a police officer may, incident to a lawful arrest, conduct a contemporaneous warrantless search of the arrestee's person and of the area into which the arrestee might reach to retrieve a weapon or destroy evidence." *United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir. 1983).  Indeed, it is difficult to think of a more "routine procedure" than a pat-down search upon a lawful arrest.[10]  Chong does not dispute that, assuming the Officers had independent cause to arrest him, the Officers would have inevitably (and lawfully) discovered the arrow key in the course of a search incident to arrest.   Instead, Chong argues that the Officers lacked probable cause to arrest him at the scene and, therefore, cannot prove that Officers Jacks and Lucero would have inevitably found the arrow key in a pat-down search incident to arrest.  (Dkt. No. 49, pp. 14-15, citing *United States v. Butts*, 704 F.2d 701 [3d Cir. 1983].)   Chong notes that his "mere presence in the car [is] insufficient to establish probable cause to arrest."

Unfortunately for Chong, the undisputed evidence before the Court demonstrates that Chong was not "merely present" in the car with the allegedly stolen

---

[10] Such pat-down searches incident to arrest are lawful under the Fourth Amendment, even if the search *precedes the arrest*, "[s]o long as an arrest that follows a search is supported by probable cause independent of the fruits of the search." *United States v. Smith*, 389 F.3d 944, 951 (9th Cir. 2004).

Third-Party Documents—he held them in his lap and, when asked, stated that they belonged to him.[11]   Having found Chong in a car with mismatched license plates holding a stack of mail, checks, credit cards, identification cards, and wage statements addressed to at least nine third-parties containing their personal identifying information, the Officers had probable cause to arrest Chong on suspicion of mail theft even without the arrow key.  *See Orin v. Barclay*, 272 F.3d 1207, 1218 (9th Cir. 2001) ("A police officer has probable cause to effect an arrest if 'at the moment the arrest was made...the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect had violated a criminal law") (quoting *Beck v. Ohio*, 379 U.S. 89, 91 [1964]).  Armed with that independent probable cause for the arrest, the Government has met its burden of proving by a preponderance of the evidence that the Officers would have inevitably discovered the arrow key in routine a post-arrest pat down.  *See United States v. Hartz*, 458 F.3d 1011, 1019 (9th Cir. 2006) (because officer "had probable cause to arrest" the defendant "a full search of [the defendant's person" was "a constitutionally permissible search incident to arrest").

The Court also finds that the preponderance of the evidence shows the Government would have inevitably discovered the arrow key during the course of their post-arrest inventory search.  Once Officers Jacks and Lucero lawfully arrested Chong on suspicion of mail theft, it was inevitable that they would discover the contents of his pockets, including the key, as part of a "lawful inventory procedure." *United States v. Andrade*, *supra*, 784 F.2d at 1433 (applying inevitable discovery where post-arrest inventory of defendant's belongings would have revealed cocaine illegally obtained at the scene of arrest).  Indeed, the evidence shows (and Chong does not dispute) that the Officers did, in fact, conduct a post-arrest inventory of Chong's

---

[11] As the Court explains in greater detail below, this limited question and answer did not violate the *Miranda* rule.

belongings after they arrived at Olympic station.  (Dkt. No. 39-1, p. 3.)  Chong offers nothing to suggest why that post-arrest inventory would not have inevitably included the key in his pocket, and the Court finds none.

## 2. The Government Has Met its Burden of Proving Inevitable Discovery of Certain Documents Related to J.S. and S.J.

Although the Government has not met its burden of establishing that any of the documents relating to J.S. and S.J. were in plain view at the scene, those items are nevertheless admissible to the extent that the Government can prove they would have been inevitably discovered in the course of a routine inventory search.

Chong does not seriously contest that the Officers were permitted to conduct a post-impoundment inventory search of all the documents that remained in the Acura.[12] But, Chong urges, because some of the documents fell from Chong's lap onto the ground, the Government must prove *which* of the documents remained in the car to be inevitably discovered.  This argument, however, is predicated on the erroneous assumption that Officers Jacks and Lucero were only permitted to take the documents in the car when they arrested Chong, and required to leave the other items the ground in the CVS parking lot.  Yet, as the leading Fourth Amendment treatise observes, "when a person is arrested in some public place while carrying a suitcase or like object…it would be clearly improper for the police to simply leave the [object] unattended at the scene of the arrest."  3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 5.5(b), p. 297 (5th ed. 2012).  Under the circumstances, it would have been unreasonable for the Officers to leave those papers

---

[12] Chong lacks standing to contest the reasonableness of the Officers' decision to impound the Acura (see footnote 5, above), and does not contest the propriety of the Officers' inventory search of the papers left in the Acura.  (See Dkt. No. 49, pp. 10-14.)

in the CVS Parking lot to be stolen, and the Officers did not err in taking them to the station for inventory.  *Accord Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009) (officer properly impounded car concurrent with driver's arrest because "[l]eaving [the] car in the drugstore parking lot would have made it an easy target for vandalism or theft"); *Miranda v. City of Cornelius*, *supra*, 429 F.3d at 864 (police may properly seize personal property under the Fourth Amendment under their "community caretaking function" where circumstances of the arrest put the property "at risk of loss").  Whether inside or outside the car, the Officers were lawfully permitted to take all the documents on Chong's person to Olympic station for inventory when they arrested him.

Moreover, the evidence is undisputed that the Officers did, in fact, collect the papers from the ground and inventoried them at Olympic station.  (Dkt. No. 39-1, p. 3.)  For many of the documents relating to J.S. and S.J., this fact alone is sufficient to meet the Government's burden under the doctrine of inevitable discovery.  While there is no evidence in the record of the LAPD's specific inventory search procedures (i.e., whether they would have opened a notebook or an envelope in the course of an inventory search), many of the documents relating to J.S. and S.J. were loose-leaf papers that would have necessarily required individual inventory.  (Dkt. No. 61, Exh. 1, 5, 8-10, 15-22.)

The result is the same with the top layer of checks bearing J.S.'s name in the transparent envelope.  (Dkt. No. 61, Exh. 7, p. 2.)  Although the Government has not met its burden of proving that the LAPD's routine inventory procedures would have required Officers Jacks and Lucero to open the envelope and examine *everything* in the envelope,[13] an officer inventorying the plastic envelope would have necessarily

---

[13] *See United States v. Young*, *supra*, 573 F.3d at 721.

1   observed the top layer of checks.

2

3       **3.      The Government Has Not Met its Burden of Proving the**

4            **Officers Would Have Inevitably Discovered the Contents of**

5            **the Notebook or the Check Register**

6

7        With respect to Chong's notebook (Dkt. No. 61, Exh. 2) and J.S.'s check

8   register (*Id.*, at Exh. 6), however, the Government has not met its burden of

9   establishing that the Officers would have inevitably discovered the contents of those

10  items in the course of an inventory search.  Certainly, the evidence is clear that the

11  Officers would have inevitably discovered the notebook and check register themselves

12  in the course of an inventory search: they were indisputably among the items the

13  Officers collected at the scene and inventoried at the station.

14

15       Still, the fact that Officers Jacks and Lucero acted lawfully under the Fourth

16  Amendment in taking those documents to Olympic station and inventorying them

17  does not mean that the Officers would have inevitably discovered *contents* – Chong's

18  handwritten notes in the notebook and J.S.'s checks.  The record is undisputed that the

19  Officers would have conducted (and did conduct) some sort of routine inventory, but

20  there is nothing to indicate the scope of what that routine search would have been.

21  *United States v. Young*, *supra*, 573 F.3d at 721.  Most notably, the Government does

22  not submit any evidence that the LAPD's routine procedures would have called for the

23  Officers to *open* a closed notebook or the check register in the context of a routine

24  inventory search.  It was the Government's affirmative burden to prove that it would

25  have inevitably discovered the contents of those items by a preponderance of the

26  evidence, and the Government's failure on that score demands that the contents of

27  those items be excluded as the result of a warrantless search not subject to any

28  exception to the Fourth Amendment's warrant requirement.  *Minnesota v. Dickerson*,

24

*supra*, 508 U.S. at 372.

E.     **The Officers' Question to Chong Regarding Ownership of the Papers Was Not a Custodial Interrogation Requiring a *Miranda* Warning**

Chong next moves to suppress his statement that the papers belonged to him, arguing the Officers failed to give Chong any *Miranda* warning before they asked him the question.  (Dkt. No. 39, p. 7.)  The parties do not dispute that the officers asked Chong whether the documents were his before giving him any *Miranda* warnings. (Dkt. No. 39, p. 3; Dkt. No. 45, pp. 1, 4-5.)  The Government argues that *Miranda* warnings were not necessary because Chong was not in custody at the time of questioning for the purposes of *Miranda*.  (Dkt. No. 45, pp. 19-22.)  Chong argues that he was in custody because a reasonable person would not have felt free to leave under the totality of the circumstances; he was ordered to refrain from touching the documents, he had been subjected to a pat-down, and police officers had found the arrow key.  (Dkt. No. 39, p. 7.)

"An officer's obligation to administer *Miranda* warnings attaches, however, only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *Stansbury v. California*, 511 U.S. 318, 322, (1994) (internal quotes omitted). Custody is a "threshold inquiry" and courts "do not reach the question of whether a defendant properly waived his *Miranda* rights unless [they] determine that a defendant was in custody, and therefore had a right to be given the *Miranda* warnings."  *United States v. Medina-Villa*, 567 F.3d 507, 518, n.5 (9th Cir. 2009). Although courts look to the totality of the circumstances in each case to determine whether a defendant was in custody at the time of the officer's inquiry, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of

movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983).   "Pertinent" factors to consider in determining whether someone is in custody "include the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1985).

Looking to the facts of this case, the Court begins with the proposition that a traffic stop is not custody; the "noncoercive aspect of ordinary traffic stops" has prompted the High Court "to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440, 444 (1984); *accord Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("the temporary and relatively nonthreatening detention involved in a traffic stop…does not constitute *Miranda* custody").   In the course of a traffic stop, an officer may order the detainee out of the car and "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" without transforming the traffic stop into a formal arrest. *Id*. at 439-40.  Likewise, where an officer's "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, the officer may detain that person briefly in order to "investigate the circumstances that provoke suspicion" without placing the detainee "in custody" for *Miranda* purposes. *Id.* at 439, quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975).  Nor does a frisk or pat-down search rise to the level of a formal arrest for the purposes of custody under *Miranda*. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001) ("A *Terry* stop-and-frisk is not custody").  *Miranda* does not require an officer give warnings "simply because…the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

1    Bearing those principles in mind, the Ninth Circuit's decision *United States v.*
2  *Davis*, 530 F.3d 1069 (9th Cir. 2008) is particularly instructive in this case.  In *Davis,*
3  the defendant pulled into his brother's secluded driveway just as the police were
4  executing a search warrant related to a marijuana growing operation.  *Id.* at 1075.
5  Davis told the officers that he was on the property to see his brother, and asked if he
6  could leave.  *Id.*  The officers told Davis he could not leave, and patted him down,
7  finding a tin of hash oil.  *Id.*  After the officers had found the hash oil another officer
8  asked Davis what he knew about the marijuana operation on the property, and Davis
9  said that he knew "everything" about the marijuana growing operation.  *Id.* at 1076.
10  Davis went on to say that he had "helped" with the operation and then asked for an
11  attorney.  *Id.*

12

13    On appeal from the district court's order denying Davis' motion to suppress the
14  statements about his involvement in the grow operation, the Ninth Circuit held that
15  Davis was not in custody for the purposes of *Miranda* when the officers asked him
16  what he knew about the marijuana grow and how he was involved.  *United States v.*
17  *Davis*, 530 F.3d at 1082.   Under the circumstances (the defendant was not in
18  handcuffs and the number of questions was "minimal") the Ninth Circuit found no
19  *Miranda* violation because the officer's questions "were all aimed at obtaining
20  information to confirm or dispel" the officer's "suspicion that [the defendant] might
21  be part of the marijuana growing operation...."  *Id.*, at 1082.  This was despite the fact
22  that the officers had already detained Davis incident to executing the search warrant,
23  told him he could not leave, patted him down, and found hash oil in his pocket.[14]

24

25    As in *Davis*, the record here makes clear that Chong was not in custody for
26  *Miranda* purposes when the officers asked him the limited question of whether the

---

[14] Possession of hashish oil (a Schedule I controlled substance) is an independent crime.  21 U.S.C. § 844(a).

27

1   papers belonged to him.  Although the officers had already detained Chong to
2   investigate the forged license plate, patted him down, found the arrow key, seen the
3   papers, and told him not to touch the papers, none of those facts rise to the level of a
4   "formal arrest" obligating the Officers to give Chong a *Miranda* warning.  *Accord*
5   *Oregon v. Mathiason*, *supra*, 429 U.S. at 495 (detainee not in custody simply because
6   the officers suspect him of a crime); *United States v. Davis*, 249 F.3d at 1099
7   (detainee not in custody where officers found evidence of a related crime during a pat-
8   down search, even where officers instructed defendant he could not leave); *United*
9   *States v. Butler*, *supra*, 249 F.3d at 1098 ("A traffic stop is not Custody.  [Citation].  A
10  *Terry* stop-and-frisk is not custody."); *see also Jacobs v. Cates*, No. ED CV 10-816-
11  GW PLA, 2012 WL 909217, at *21 (C.D. Cal. Feb. 9, 2012) (no custody for *Miranda*
12  purposes where defendant admitted to having an outstanding warrant during course of
13  traffic stop before admitting that he had used drugs).

14

15       Other aspects of the officers' sole question also demonstrate that Chong was not
16  in custody at the time.  Officers Jacks and Lucero had not handcuffed Chong or placed
17  him in the back of their patrol car.  *Compare United States v. Henley*, 984 F.2d 1040,
18  1042 (9th Cir.1993) (concluding that, despite being told he was not under arrest,
19  appellant was in custody for *Miranda* purposes where appellant was "questioned by an
20  FBI agent while sitting handcuffed in the back of a police car.")  Nor had had they
21  moved him from the "public" atmosphere usually associated with a traffic stop to the
22  "police dominated" atmosphere of a police station or interrogation room.  *See*
23  *Berkemer v. McCarty*, *supra*, 468 U.S. at 421 ("the typical traffic stop is conducted in
24  public, and the atmosphere surrounding it is substantially less 'police dominated' than
25  that surrounding the kinds of interrogation at issue in *Miranda* and subsequent cases
26  in which *Miranda* has been applied").  During a routine inquiry into an apparent
27  traffic violation, they briefly detained Chong in a public place and asked him a single
28  question to confirm or dispel their suspicion that he may have been involved in some

28

1  sort of mail theft or fraud.  Under the totality of the circumstances, nothing about that

2  relatively mundane interaction crossed the line into the sort of restraint on Chong's

3  freedom that would be akin to a formal arrest.  *See United States v. Davis*, *supra*, 530

4  F.3d at 1081-82.

5

6      Chong attempts to distinguish *Davis* by noting that *Davis* involved the

7  execution of a search warrant and argues that, unlike *Davis*, "the police were already

8  focused on Mr. Chong, and the question they asked was directly related to the

9  incriminating evidence they had already found."  (Dkt. No. 49, p. 16.)  Notably,

10  Chong cites no authority for the proposition that detaining someone incident to a

11  traffic stop is somehow more custodial that detaining someone incident to executing a

12  search warrant.  Both are lawful reasons to briefly detain someone.  If anything, the

13  circumstances of Chong's short detention in a public parking lot in broad daylight are

14  even less custodial than in *Davis*, where the defendant was surrounded by (and

15  questioned by) numerous law enforcement officers, in a secluded area, after being told

16  he could not leave.[15]  And, as here, Davis made his statement after officers had

17  already patted him down and found evidence of a crime in his pocket.  Again to the

18  extent the facts in *Davis* are distinguishable, it is only because the circumstances in

19  *Davis* were *more* custodial in that the incriminating evidence the officers found (hash

20  oil) was directly related to the underlying crime the officers were investigating (a

21  marijuana grow) pursuant to a search warrant.

22  ///

23  ///

24  ///

25

26  [15] To use the Supreme Court's formulation in *Berkemer*, the "the atmosphere surrounding" the
instant case was "substantially less 'police dominated'" than in *Davis*, which itself did not rise to the
27  level of custody for a *Miranda* warning.  *Berkemer v. McCarty*, 468 U.S. at 438-39.

28

### F.     The Search Warrants Were Supported by Probable Cause

Finally, Chong argues that the search warrants for his home and cell phone were not supported by probable cause because they relied on evidence of the arrow key, the papers found in Chong's lap, and on Chong's statement that the papers belonged to him.  (Dkt. No. 39, p. 8.)  In light of the Court's conclusion that Chong's arguments relating to those items of evidence are largely unavailing, his derivative arguments regarding the subsequent search warrants are similarly unpersuasive. Chong does not argue, and the Court does not find, that the search warrants would be unsupported by probable cause without the notebook, the check register, and the checks in the plastic envelope.  In light the admissible evidence of:

> (1) the arrow key;
> (2) the Third-Party Documents;
> (3) Chong's statement the Third Party Documents were his;
> (3) the bulk of J.S.'s and S.J.'s documents;
> (4) McClintock's confession; and
> (5) numerous victim statements

the warrant applications were supported by ample probable cause.

## IV.    CONCLUSION

In light of the foregoing, the Court **DENIES** Chong's motion to suppress evidence obtained during his initial detention as to all of the items identified in Docket Number 61 with the exception of Exhibits 2, and 6, and all but the first two pages of Exhibit 7.  Chong's initial detention was both reasonable and lawful, and Officers Jacks and Lucero did not violate Chong's Fourth Amendment rights when they

1    ordered him out of the vehicle in the course of their investigation into the potentially

2    fraudulent license plate.  Moreover, Chong has failed to meet his burden of proving a

3    legitimate expectation of privacy in any of the Third Party Documents, or in the

4    Acura.

5

6        As to the remaining documents relating to J.S. and S.J. (in which Chong

7    appears to have had a legitimate expectation of privacy), the Government has largely

8    met its burden of proving inevitable discovery. Likewise, even if the Officers lacked

9    reasonable suspicion to pat Chong down when they found the arrow key, the

10   Government has met its burden of proving that the Officers would have inevitably

11   discovered the key in the course of a post-arrest or inventory search of Chong's

12   person. Finally, the totality of the circumstances demonstrates that Chong was not "in

13   custody" for the purposes of *Miranda* at the time the officers asked him whether the

14   papers belonged to him, and they cannot have violated his Fifth Amendment rights by

15   asking that question without first obtaining a *Miranda* waiver.  The Court, therefore,

16   also **DENIES** Chong's motion to suppress his statement to the officers that the items

17   in his lap belonged to him.

18

19       However, the record reflects that Chong had a legitimate expectation of privacy

20   in the notebook, the check register and the contents of the plastic envelope.  The

21   record further shows that (with the exception of the top layer of checks in the plastic

22   envelope) the Government searched the contents of those items without a warrant and

23   without any exception to the Fourth Amendment's warrant requirement.   Such

24   warrantless searches are presumptively unlawful, and the Court **GRANTS** Chong's

25   motion to suppress their contents.  (Dkt. No. 61, Exh. 2, 6, 7 [pages one and two

26   excepted].)  Fed. R. Crim. P. 41(h).

27

28       Because the Court denies Chong's motion on the merits, it need not consider

the Government's procedural argument that the motion violates Central District Local Criminal Rule 12-1.1.  (*See* Dkt. No. 45, pp. 6-8.)

**IT IS SO ORDERED**

Dated:  September 2, 2015

_____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE